

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JOHN DOE,                                             :

                               **Plaintiff,**     :

                                              :

                  **-against-**       :

                                              :

**HAMILTON COLLEGE, HAMILTON COLLEGE**  :
**BOARD OF TRUSTEES, LINDSEY BOBER,**  :
**as agent for HAMILTON COLLEGE,**  :
**LISA MAGNARELLI, as agent for**  :
**HAMILTON COLLEGE, THERESA MARTINEZ,**  :
**as agent for HAMILTON COLLEGE, and**  :
**BENJAMIN MUDRICK, as agent for**  :
**HAMILTON COLLEGE,**  :

                                            :

                        **Defendants.**    :
--------------------------------------------------------------------X

**Civil Action No:** 6:17-CV-1202 (MAD/ATB)

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.     This case arises out of the actions taken and procedures employed by Defendants Hamilton College ("Defendant Hamilton" or "Hamilton" or the "College"), Hamilton College Board of Trustees ("Defendant Board of Trustees"), Lindsey Bober ("Defendant Bober" or "Bober"), Lisa Magnarelli ("Defendant Magnarelli" or "Magnarelli"), Theresa "Terry" Martinez ("Defendant Martinez" or "Martinez"), and Benjamin Mudrick ("Defendant Mudrick" or "Mudrick") concerning actions taken against Plaintiff, a male senior student at Hamilton, as a result of false allegations of nonconsensual sexual activity with fellow Hamilton senior student Jane Roe.

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.

2.     On May 9, 2017, twelve days before he was supposed to graduate from Hamilton College, John Doe was banned from campus, banned from Senior Week Activities, denied his status as a graduating senior, and prohibited from walking with his class at the upcoming commencement because four separate women, in concert and with a malicious purpose, lodged false complaints of sexual misconduct against Doe for events that allegedly occurred over three years in the past.

3.     One of those women withdrew her complaint just days after Doe's removal from campus, another withdrew her complaint two days after Doe should have graduated, and Doe was ultimately found not responsible for sexual misconduct in the case of the third.

4.     As to the fourth woman, however, Defendants erroneously concluded, on August 28, 2017, that Doe had engaged in a non-consensual sexual act with her in the winter of 2014 ("the Decision"). Notably, Defendants did not conclude that this woman was telling the truth about what had occurred; instead, they found that she was incapacitated by alcohol at the time of her interaction with Doe and thus unable to consent to sexual activity. They reached this conclusion even though there was ample evidence that her story lacked credibility, and no evidence she lacked the ability to consent.

5.     Although a Review Panel recommended that Doe be suspended for five years as a result of the finding of responsibility, Defendant Terry Martinez, Hamilton's Vice President and Dean of Students, arbitrarily and capriciously increased the sanction and expelled John Doe on September 12, 2017 ("the Sanction").

6.     The process for adjudicating the female student's complaint of sexual misconduct was biased against Doe from the beginning. Hamilton's Sexual Misconduct Policy (the "Policy"), on its face, discriminates against men accused of sexual misconduct. The Policy

affords the women who accuse a presumption of truth, blamelessness, and the full weight of institutional support.

7.      A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (iii) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (iv) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (v) the Sanction was unwarranted and disproportionate in light of the circumstances, all of which demonstrated substantial procedural errors in violation of Title IX and other federal and state laws.

8.      When Defendants subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way, and discriminated against him on the basis of his gender. Defendants failed to adhere to certain aspects of Hamilton's own guidelines and regulations, and the guidelines and regulations to which they did adhere are inherently discriminatory and insufficient to protect the rights of accused male students. Further, the Decision itself was clearly discriminatory; given the evidence (or lack thereof), the only possible way Defendants could have reached it was a bias against males and an underlying motive to protect Hamilton's reputation and financial wellbeing.

9.      As a result of Defendants' discriminatory and unlawful conduct, Doe was denied the opportunity to receive his degree from the college he attended for four years and at which he completed all of the requisite coursework for a degree. Moreover, he was ostracized from his friends and from the campus community, made a social pariah, and forever damaged emotionally

by the excruciating and unfair process and the terribly unjust results flowing therefrom. Doe has also sustained damages to his future education and career prospects as a result of the Decision and Sanction.

10.     John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, breach of contract and other state law causes of action.

## THE PARTIES

11.      Plaintiff is a natural person, citizen of the United States, and resident of the State of California. During the events described herein, Plaintiff was a student at Hamilton College and resided on Hamilton's campus in Clinton, New York.

12.     Upon information and belief, Defendant Hamilton is a private, liberal arts college in the city of Clinton, New York, with an address of 198 College Hill Road, Clinton, New York 13323.

13.     Upon information and belief, Defendant Board of Trustees is the governing body of Hamilton College. It is composed of 36 Charter Trustees and 12 Alumni Trustees. Upon information and belief, it oversees and approves Hamilton's written policies, including its Sexual Misconduct Policy.

14.     Upon information and belief, Defendant Bober is an individual residing in the State of New York and was a member of the Hamilton College Investigative Team at all relevant times herein.

15.     Upon information and belief, Defendant Magnarelli is an individual residing in the State of New York and was the Title IX Coordinator at all relevant times herein.

16.     Upon information and belief, Defendant Martinez is an individual residing in the State of New York and is Vice President and Dean of Students at Hamilton College.

17.     Upon information and belief, Defendant Mudrick is an individual residing in the State of New York and was a member of the Hamilton College Investigative Team at all relevant times herein.

18.     John Doe and Defendants Hamilton, Board of Trustees, Bober, Magnarelli, Martinez and Mudrick are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

19.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and under 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) John Doe and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

20.     This Court has personal jurisdiction over Defendant Hamilton on the grounds that it is conducting business within the State of New York.

21.     This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of New York and is the governing body of Hamilton College.

22.     This Court has personal jurisdiction over Defendant Bober on the grounds that she was acting as an agent of Hamilton at all relevant times herein.

23.     This Court has personal jurisdiction over Defendant Magnarelli on the grounds that she was acting as an agent of Hamilton at all relevant times herein.

24.     This Court has personal jurisdiction over Defendant Martinez on the grounds that she was acting as an agent of Hamilton at all relevant times herein.

25.     This Court has personal jurisdiction over Defendant Mudrick on the grounds that he was acting as an agent of Hamilton at all relevant times herein.

26.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Hamilton is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Agreements, Representations, Covenants and Warranties Between Plaintiff and Hamilton College

27.     Prior to matriculating at Hamilton College, Doe attended Henry M. Gunn High School in Palo Alto, California. He was an excellent student and gave back to his community, logging hundreds of volunteer hours teaching underprivileged children the basics of reading and reading comprehension.

28.     In the fall of 2013, Doe left his home in California and traveled more than 3,000 miles from his family to attend Hamilton College in Clinton, NY. There, he excelled. He majored in Government and maintained an overall grade point average of 3.48. He participated in Student Assembly, Philanthropy Committee, and Hamilton Men's Crew.

29.     Prior to September of 2017, four months after Doe was set to graduate, Doe maintained an unblemished disciplinary record.

30.     Upon his acceptance to the College, Hamilton provided John Doe with copies of its school policies, including the Sexual Misconduct Policy (the "Policy"), the 2016-2017 edition of which is available on Defendant Hamilton's Internet website.

31.     With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, the Policy states in relevant part:

> All members of the Hamilton College community are expected to conduct themselves in a manner that does not infringe upon the rights of others. Hamilton seeks to provide an environment in which students, faculty, staff, and guests can work, study, and enjoy the College community without experiencing sexual misconduct, domestic violence, dating violence, or stalking. In addition to being antithetical to Hamilton community values, these acts are prohibited under College policy, New York State law and by federal laws such as Title IX. When such actions are brought to its attention, the College is committed to providing prompt and thorough responses to actions that adversely impact, or have the potential to adversely impact, the educational or workplace environment of any member of the Hamilton community.
>
> The College strongly encourages all members of its community to report any prohibited act of sexual misconduct which they experience . . . to the College and to immediately seek appropriate support and health care.

32.     The Policy, on its face, is meant to support accusers, rather than *both* the accuser and the accused:

> This Policy has been developed to provide recourse for individuals who believe their rights have been violated, and serves as a means to determine, after the fact, if specific behaviors constitute violations of this Policy.
>
> Any individual who has experienced Sexual Misconduct has the right to make a report to Campus Safety, local law enforcement, and/or the New York State Police, or choose not to report; to report the incident to the Title IX Coordinator; to be protected by the institution from retaliation for reporting an incident; and to receive assistance and resources from the College.
>
> This Policy describes support resources and accommodations available to members of the Hamilton community who experience Sexual Misconduct, whether or not that individual decides to pursue a formal report on campus.
>
> (Emphasis added.)

33.     On information and belief, Hamilton knew, when it wrote the Policy, that nearly all of the individuals who are accused of sexual misconduct are men, and nearly all of their accusers are women. Thus, it understood that the Policy, as written, is more protective of women than men.

34.     On information and belief, Defendant Board of Trustees reviewed and authorized the Policy in its current form.

35.     The case involving Doe arose during a critical period at Hamilton in which the College faced mounting criticism concerning its handling of allegations of sexual assault made by female students against male students. Specifically, Hamilton students openly and vocally accused the College of not taking allegations of sexual misconduct seriously enough and of failing to harshly punish perpetrators of sexual assault. As a consequence, Hamilton was under enormous pressure to show it was willing to take a hard line against male students accused of sexual assault in order to dispel the notion that its campus was an unfriendly and unsafe environment for women.

36.     On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter ("DCL"). The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

37.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A"). Like the DCL, the Q&A was aimed at addressing educational institutions'

sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

38.    On September 22, 2017, OCR rescinded the DCL and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See*, *e.g.*, https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

39.    The interim guidance and review suggest that the practices in place at all times relevant to this lawsuit were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

40.    For example, the new OCR guidance, in a significant departure from the 2011 Dear Colleague Letter, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.

41.    Significantly, the new OCR guidance also requires that "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

42.    The interim guidance and review suggest that the practices in place at all times relevant to this lawsuit were unfair and, ultimately, out of step with the goal of gender equity in

Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

43.     In response to the Q&A, Hamilton substantially revised its Policy in September of 2014. Most significantly, it completely eliminated students' right to a formal hearing (and, thus, all of the procedural safeguards inherent in the formal hearing process) and instead adopted a so-called "investigation model." According to Hamilton's then-Title IX Coordinator, Meredith Harper Bonham, the hearing process was "traumatizing" for students because it "force[d]" them to retell their stories. *College Recommends Changes to Harassment and Sexual Misconduct Policy*, September 11, 2014 (available at https://students.hamilton.edu/spectator/news/p/college-recommends-changes-to-harassment-and-sexual-misconduct-policy/view). The new Policy also eliminated student members from the College's Harassment and Sexual Misconduct Board.

44.     The 2016-2017 Policy to which Doe was subject, at least as to the process by which the claims against him were adjudicated, sets forth the procedures by which Hamilton students like Doe, who have been accused of violating one or more of the enumerated offenses, are investigated, heard and, possibly, disciplined.

45.     Relevant to the instant matter is the process by which complaints of sexual misconduct are investigated and adjudicated after a report of alleged sexual misconduct is made to Hamilton's Title IX Coordinator.

46.     The Title IX Coordinator is "[t]he individual who oversees the College's centralized review, investigation, and resolution of reports of Sexual Misconduct pursuant to [the] Policy. The Title IX Coordinator also coordinates the College's compliance with Title IX, including equitable, timely, and effective processing of complaints regarding violations of rights protected by Title IX."

47.     Hamilton College uses an "investigative model" to resolve formal complaints of sexual misconduct. In summary, it involves the following process.

48.     An "Investigative Team" ("Investigative Team" or "the Team") is tasked with interviewing all parties and witnesses and collecting all relevant information. The Team is assigned by the Title IX Coordinator.

49.     In cases involving an allegation of non-consensual sexual contact, like the present one, the Team will include a member of Hamilton's Harassment and Sexual Misconduct Board ("HSMB") and at least one external investigator.

50.     There is no specific time limit for conducting the investigation, but the Team "will make every effort to conclude a thorough investigation, including submission of its written report, within 30 business days of the receipt of a complaint."

51.     Per the Policy, the complainant and respondent are "invited to offer and/or identify all information they would like the Investigation Team to review, and both may recommend witnesses and submit information for consideration. Decisions about interviews and collection and evaluation of relevant information, physical or electronic documents, and other tangible items, however, are ultimately at the sole discretion of the Investigation Team in the context of impartial treatment of both parties."

52.     At the conclusion of the investigation, both parties have the opportunity to "review the other party's statement, relevant witness statements and other relevant materials gathered during the course of the investigation," all of which is gathered in the Team's "initial report." Although the parties are allowed to view the initial report, they are not allowed to retain a copy.

53.     Each party then has seven (7) days to respond, in writing, to the initial report, and may request to see each other's responses. As with the initial report, parties are not allowed to retain copies of each other's responses.

54.     Following the review and response period, "the Investigation Team will complete their final written report and, within 7 days, meet with the Chair and Title IX Coordinator to deliver that final written report" (the "final report") which, per the Policy, must "include relevant facts, all relevant investigation materials, Complainant and Respondent statements and responses to the other's statement, and any additional information gathered."

55.     The Title IX Coordinator will then notify the complainant and respondent that the final report is completed, and each will have a chance to review the report. Neither party may retain, or respond to, the final report.

56.     Once the final report is complete, the Title IX Coordinator convenes a Review Panel (the "Panel"), which reviews the final report. The Panel "may" request additional relevant information, and/or request to meet with any person(s).

57.     The Panel may also, but need not, meet with the complainant and/or the respondent. "The focus of any such meeting will only be to clarify information presented in the Investigation Team's final report."

58.     Using the information provided to it by the Investigation Team, the Panel is responsible for arriving at a determination as to whether the Policy was violated and, if so, recommending a sanction for the respondent. The Panel utilizes a "preponderance of evidence" standard when making its determination.

59.     The Panel makes its recommendation for sanction to the Senior Staff Member. "The Vice President and Dean of Students is the Senior Staff Member with respect to complaints brought against a student."

60.     The Senior Staff Member makes a final decision "based on the Review Panel's determination and recommendation and the final Investigation Team report, subject to the Senior Staff Member's right to meet individually with any person."

61.     Once such a decision is made, the Senior Staff member and Chair of the Review Panel meet with the complainant and respondent in order to relay the determination and sanction, and to inform each party of the right to appeal.

62.     "In general, parties can expect that the College will conclude all reports of Sexual Misconduct within sixty (60) days (exclusive of any appeal) and, in general, parties can expect that the process will proceed according to the time frames provided in this Policy."

63.     The parties have a right to appeal the Senior Staff Member's decision within seven (7) days. Any request for appeal must be submitted in writing to the Chair of the Appeals Board. The Appeals Board must then, within seven (7) days after receipt of the appeal, meet "for consideration and disposition of the appeal." Decisions of the Appeals Board are considered final.

64.     According to the Policy, both the complainant and the respondent are entitled to certain common rights throughout the process, including, without limitation, the right to:

     a.  "participate in a process that is fair, timely, impartial, and provides adequate notice and a meaningful opportunity to be heard";

     b.  "have complaints investigated and reviewed in a timely, impartial and thorough manner, by individuals who have received annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of respondent (including the right to a presumption that the respondent is "not

responsible" until a responsibility determination has been made), and other issues relating to sexual assault, domestic/dating violence and stalking"; and

c.   "have College policies and procedures followed without material deviation."

65.   Although Hamilton promised Doe these (and other) rights, Defendants nevertheless treated him in a manner that clearly violated his rights under the Policy, under Title IX, and under other state laws as set forth more fully below.

### Pressure on Hamilton to Expel Alleged Perpetrators

66.   In the wake of the "Dear Colleague" letter, as well as the additional 2014 Q&A, the DOE commenced numerous investigations against colleges and universities, with the underlying threat that those not in compliance stood to lose federal funding.

67.   Hamilton found itself on the receiving end of at least one such investigation after a complaint was lodged against it with OCR on November 14, 2014, for allegedly mishandling an allegation of sexual assault. On information and belief, the matter remains pending as of the filing of this lawsuit.

68.   The OCR investigation was not the only outside pressure on Hamilton to strengthen its response to complaints of sexual misconduct, however.

69.   On or about September 3, 2015, Defendant Magnarelli was named Interim Senior Associate Dean of Students and Title IX Coordinator. Prior to this position, Magnarelli was Hamilton's Greek Life Advisor.

70.   Magnarelli had never before served as a Title IX Coordinator. At the time she assumed her position, she "acknowledge[d] that there was a lot of catching-up for her to do in regards to educating herself about federal and state gender equity and equal protection mandates, as well as sexual-misconduct prevention and response procedures already put into place on campus." *Lisa Magnarelli named interim Title IX Coordinator*, September 3, 2015 (available at

http://students.hamilton.edu/spectator/news-2015/p/lisa-magnarelli-named-interim-title-ix-coordinator/view.)

71.      In October of 2016, amidst the growing national conversation about sexual assault on college campuses, students began to openly question the adequacy of Defendants' response to complaints of sexual misconduct at Hamilton.

72.      On or about October 3, 2016, Defendant Magnarelli sent to the Hamilton Community the HSMB's annual report for the academic year 2015-2016 (the first year of Magnarelli's tenure as Title IX Coordinator). The report summarized the results of 19 reported violations of Hamilton's Sexual Misconduct Policy, five of which were investigated as formal complaints. Four of those complaints were against students.

73.      As detailed in the report, two students were found responsible for sexual harassment, and one was also found responsible for dating violence. Each student received six disciplinary points, and one received a one-semester suspension. Two other students were found responsible for sexual harassment and non-consensual sexual contact and received two points each.

74.      There was an immediate and vocal student backlash about the lack of disciplinary action against alleged perpetrators of non-consensual sexual contact.

75.      On or about October 10, 2016, there was a Student Assembly meeting regarding the 2015-2016 HSMB report. Defendant Magnarelli was present at the meeting, as employees and agents of Defendant Hamilton College, in order to address and defend the College's response to complaints of sexual misconduct.

76.      Defendant Magnarelli told those in attendance at the Student Assembly meeting that she had "no interest in protecting rapists" and that students found responsible for non-

consensual penetration would be expelled. As Magnarelli put it, "The [C]ollege is not interested in protecting students who are found responsible for that act." *Administration addresses students' HSMB policy concerns*, October 20, 2016 (available at http://students.hamilton.edu/spectator/news-2015/p/administration-addresses-students-hsmb-policy-concerns/view.)

77.     This statement was directly at odds with Hamilton's Sexual Misconduct Policy, which explicitly provides: "Individuals found responsible for a Non-consensual Sexual Act (penetration and/or oral contact) should expect <u>suspension *or* expulsion</u> from the College." (Emphasis added.)

78.     Nevertheless, Defendant Magnarelli made clear that despite Hamilton's clear policy, she was going to make sure "rapists" were expelled.

79.     Magnarelli also detailed, at the Student Assembly meeting, her plans to improve Hamilton's practices around sexual misconduct issues. Magnarelli indicated that, in order to accomplish this goal, she would be working with a new student group called the Sexual Misconduct and Assault and Reform Taskforce ("SMART").

80.     SMART was founded by Hamilton College students with an aim is "to better equip all members of the Hamilton community to help prevent and combat sexual misconduct on campus."

81.     In an editorial piece published in Hamilton's student newspaper on October 20, 2016, Sally Smith,[2] a member of SMART, opined that women and girls do not feel safe at Hamilton, and that all perpetrators should be expelled.

82.     On information and belief, Defendant Magnarelli did thereafter ally herself with SMART and Sally Smith.

---

[2] Plaintiff refers to Smith pseudonymously.

83.     On further information and belief, Defendant Magnarelli did not solicit the input, or take into consideration the position of, any groups representing the rights of accused male students.

84.     One of SMART's early concerns was "the lack of reporting from student survivors, which they feel indicates a lack of trust in the College's policy for dealing with sexual assault. Operating around a belief that increased reporting at Hamilton would represent a parallel increase in students' confidence in the administration's ability to protect and support survivors," SMART began "working to find ways to make the reporting process more accessible and comfortable for survivors of sexual assault or misconduct. *SMART prepares new student training programs*, December 1, 2016 (available at http://students.hamilton.edu/spectator/news-2015/p/smart-prepares-new-student-training-programs/view.)

85.     On information and belief, Defendants actively adopted SMART's mission of increasing reporting of alleged sexual misconduct at Hamilton College. Unfortunately, they did so at the expense of properly vetting complaints of sexual misconduct to ensure the students who were making the reports did so on a good faith basis.

86.     Less than one year after Defendants partnered with the victims' rights group SMART, John Doe himself became the victim of a vicious and vindictive campaign to smear his reputation and get him expelled from Hamilton.

## The First Set of Complaints Against John Doe

87.     On April 7, 2017, John Doe had what he thought was a friendly conversation with a male acquaintance, MF. In that conversation, Doe observed that men often get jealous when they learn their girlfriends have been with other men, even if that contact is in the past.

88.     Doe used as an example the fact that he had had sexual contact with MF's girlfriend, Betty Brown,[3] over three years earlier. This contact was entirely consensual. MF and Brown were not a couple at the time.

89.     Doe's conversation with MF set in motion a chain of events ultimately leading to his own expulsion from Hamilton.

90.     On information and belief, MF confronted Brown about her previous involvement with Doe. Either at the behest of, or in order to save her relationship with, MF, Brown then filed a complaint of sexual misconduct against Doe with Hamilton's Title IX coordinator, Defendant Magnarelli.

91.     Brown filed the complaint some time in the two weeks after Doe's conversation with Brown's boyfriend, MF. In the complaint, Brown falsely claimed that Doe had engaged in a "non-consensual sexual act" with her in early September, 2014.

92.     Hamilton's Sexual Misconduct Policy defines a non-consensual sexual act as "penetration and/or oral contact, however slight, with any body part or object with the genitals or anus of another person, without affirmative consent."

93.     In fact, as set forth above, the contact between Brown and Doe was entirely consensual. Brown even expressed to Doe in a text message following the contact that she "had fun tonight."

94.     On or about the same day Brown filed her complaint, another female friend of MF's, Mary Miller,[4] filed a complaint of sexual misconduct against John Doe with Defendant Magnarelli.

---

[3] Plaintiff refers to Brown pseudonymously.
[4] Plaintiff refers to Miller pseudonymously.

95.     On information and belief, Miller also filed her complaint at the urging of MF, who wanted to ensure Doe would be adequately punished for having had sexual contact with MF's girlfriend. MF sent a text message to Miller encouraging her to file the complaint, and helped Miller craft her written complaint.

96.     Miller's complaint likewise falsely accused Doe of "non-consensual sexual contact" that allegedly occurred on February 28, 2015.

97.     Hamilton's Sexual Misconduct Policy defines non-consensual sexual contact as "any intentional sexual touching, however slight, with any body part or object without affirmative consent."

98.     In fact, Miller and Doe did not have *any* contact, sexual or otherwise, on February 28, 2015. Miller and Doe did have sexual contact on November 7, 2014, but Doe's sexual interactions with Miller were entirely consensual, and the narrative Miller provided was simply false.

99.     On information and belief, MF helped Miller draft her complaint of sexual misconduct against Doe. He provided language he believed she should use in the body of the complaint, and otherwise provided feedback to her regarding her statement of the events in question. He told Miller to keep his name out of it so that "Doe's lies about conspiracy will be less believable." Miller promised MF that she was "committed to seeing this process through to the end," or words to that effect.

100.    Doe received notice of both the Brown and Miller complaints on April 26, 2017. He also received no-contact orders as to each accuser. He did not receive notice concerning the substance of either complaint, however, even though the events in question in each case allegedly occurred more than three years earlier.

101.    Hamilton's Sexual Misconduct Policy dictates that the College may impose "interim measures," including "temporary removal from campus," in order to "ensure the safety of all parties, the broader College community, and/or the integrity of the investigative and/or complaint resolution process."

102.    Other than the no-contact orders, Hamilton did not put in place any interim measures designed to restrict Doe's contact with the student body at large or his access to campus as a result of the two complaints.

103.    On April 28, 2017, Doe met with Defendant Magnaralli about the Brown and Miller complaints.

104.    During the meeting, Magnarelli did not discuss with Doe his rights as an accused student, or the process he would face in the coming months. Rather, she simply provided Doe with paper copies of the school's policies and a "roadmap" of the sexual misconduct investigation process without further explanation or counseling. The entire meeting lasted mere minutes.

105.    As noted above, the Policy, on its face, gives complainants greater rights than respondents, even at the earliest stages of the complaint process. Under the Policy, "the Title IX Coordinator *will meet with the Complainant and explain the investigation procedures that will be followed*. The Title IX Coordinator will meet separately with the Respondent to provide written notification that Hamilton is investigating the possibility that the Respondent may have violated this Policy." (Emphasis added.) In other words, Defendants give respondents no concomitant right to basic fairness, including the very rudimentary right to an explanation of the investigation procedures in which they are about to become embroiled.

106.    The practical and desired effect of this discriminatory policy is that female complainants – clearly perceived by Hamilton as the party deserving of institutional protection – are patiently guided through the process from day one, whereas male respondents are left to figure out the process for themselves, even as their very futures are at stake.

107.    Similarly, Hamilton's Sexual Misconduct Policy provides a list of resources for individuals who "have experienced an act of Sexual Misconduct." The Policy does not provide any resources for individuals who have been accused of an act of Sexual Misconduct.

108.    Hamilton did not provide Doe with information concerning resources for male students accused of sexual misconduct. Consequently, and by design, Doe had no idea to whom he should turn when faced with very serious accusations with potentially dire consequences.

### The Second Set of Complaints Against Doe

109.    On May 5, 2017, Doe and MF were at the same concert. MF was there with Brown, and Doe attempted to keep distance between them because of the no-contact order with Brown. However, MF pointedly made eye contact with Doe and then made a threatening gesture. As Doe tried to leave the area, MF followed him, grabbed his shoulder, and pulled him backwards. Doe's friends intervened. As the concert ended, MF followed Doe and his friends and taunted Doe.

110.    The following day, Doe reported to Defendant Magnarelli that MF had acted in a threatening and aggressive manner and that he did not feel safe.

111.    Defendant Magnarelli thereafter informed Doe that she e-mailed MF and warned him not to engage in the reported behavior again. Despite Doe's repeated requests for a copy of this e-mail, Magnarelli has never provided it to him.

112.    Defendant Magnarelli did not otherwise take adequate steps to ensure that Doe was protected from MF.

113.    Hamilton's Code of Student Conduct prohibits "Physical abuse, verbal abuse, threats, intimidation, harassment, coercion and/or other conduct that recklessly or intentionally threatens or endangers the mental or physical health and safety of any person." Similarly, the Sexual Misconduct Policy prohibits retaliation against any individuals involved in the processes outlined in the Policy.

114.    Despite the clearly threatening behavior MF exhibited towards Doe at the aforementioned concert, MF was never charged with any violations of campus policy.

115.    Likewise, MF's use of Hamilton's Sexual Misconduct Policy as a weapon against Doe in a manner designed to cause Doe psychological and educational harm was a violation of the Code of Student Conduct, but MF was never charged with such a violation.

116.    On information and belief, MF, who was further enraged by the fact that Doe reported his behavior to Defendant Magnarelli, continued his quest to recruit women to file complaints against Doe in an effort to get Doe removed from campus altogether.

117.    In order to accomplish this, MF sought the assistance of LL, a female Hamilton student. On information and belief, MF told LL about the pending complaints and asked LL to find other women who would be willing to lodge sexual misconduct complaints against Doe.

118.    On further information and belief, after communicating with MF, LL contacted another female student at Hamilton, Rachel Roe,[5] and told Roe that "a few" female students had filed complaints against Doe and "if you report it might help[.]" LL also told Roe that she would consult Sally Smith, a member of SMART, who was familiar with the Title IX process.

---

[5] Plaintiff refers to Roe pseudonymously.

119.    As a direct result of MF's conversation with LL and LL's subsequent conversation with Roe, Roe filed a false complaint against Doe for a "non-consensual sexual act" that allegedly took place late in the evening of January 31, 2014, and into the early morning hours of February 1, 2014.

120.    The same day, Sally Smith filed a complaint against Doe, falsely alleging that she had had "non-consensual sexual contact" with Doe on January 19, 2014.

121.    Indeed, as Doe would later find out, Smith filed the complaint against him knowing it was false, and knowing there was evidence of its falsity. Specifically, Smith recorded a conversation between her and Doe sometime in or around the spring of 2014 in which she stated that Doe did not sexually assault her.

122.    On information and belief, Smith and Roe filed their complaints together and in concert with one another at the urging of LL. On further information and belief, Smith had been through the complaint process before and understood that multiple reports against the same individual would likely result in that individual's removal from campus.

123.    On further information and belief, Smith and Defendant Magnarelli were acquainted, and Defendant Magnarelli had a personal interest in pursuing Smith's claim in order to continue to prove to Smith, a prominent survivors' rights activist on campus (and, by extension, the entire activist community at Hamilton), that Hamilton would be "tough" on alleged "perpetrators."

124.    LL and Roe subsequently exchanged Facebook messages celebrating the probable success of their plan: "they might remove him from campus tbh [to be honest] and a few weeks before graduation [devil face emoji]." Roe also told LL that LL should "feel free to let the other girls know that [Smith] and I reported [Doe]."

125.    Doe received notice of both complaints on May 9, 2017, thirteen days after receiving notice of the two initial complaints and four days after MF confronted him at the concert.

126.    Although Roe admitted that she and CB reported Doe together, and although, on information and belief, the two met with Defendant Magnarelli together, Magnarelli falsely told Doe the Roe and CB complaints were independent.

127.    Taken together, these complaints had the desired effect: on May 9, 2017, Defendant Magnarelli informed Doe that, as of May 14, 2017, he was banned from campus, prohibited from participating in Senior Week events, and declared ineligible for graduation, which was to take place on May 21, 2017.

128.    The purported reason for imposing these highly damaging interim measures on Doe was the fact that Doe now had four complaints of sexual misconduct against him.

129.    Notably, the Policy allows the College to take such interim measures with the specific goal of "reducing the burden on the Complainant." Respondents are not accorded similar interim measures designed to reduce the burden on them.

130.    Alarmingly, no one at Hamilton considered it at all suspicious that, in the space of just two weeks, four separate women made complaints against Doe for sexual conduct that had all allegedly occurred over three years prior to the complaints.

131.    It is Hamilton's policy to accept the allegations of female complainants as true. According to the Policy, a complainant has a right "to be free from the suggestion that [she] is at fault when these crimes or violations are committed, or should have acted in a different manner to avoid such crimes or violations[.]"

132.    A male respondent has no concomitant right, under Hamilton's Policy, to be free from the suggestion that he is at fault, or should have acted in a different manner, when a complainant has reported an alleged "crime[] or violation."

133.    In a perfect example of the College treating female complainants more favorably than male respondents, even in the face of mounting evidence of a conspiracy on the part of the female complainants, Hamilton's response to the highly suspiciously timed complaints against Doe was to assume their truth and take preemptive and punitive action against Doe.

## Two False Complaints Are Withdrawn

134.    Once the goal of getting Doe kicked off campus had been achieved, the proverbial house of cards built by the female complainants began to crumble. Just days after Doe was banished from Hamilton and denied the opportunity to graduate with his class, Smith withdrew her complaint against Doe.

135.    A few days later, after Doe provided Defendants with text messages from Brown, including the one in which she declared "I had fun tonight" (the night she was now claiming involved non-consensual sexual activity), Brown likewise withdrew her complaint against Doe. She did so two days after Doe was supposed to graduate with his class.

136.    Nevertheless, even though two of the false complaints against Doe were no longer pending, and even though the stated reason for rescinding Doe's privileges as a Hamilton senior and community member – the number of complaints against him – was no longer even valid, Hamilton made no move to restore Doe's status as a graduating senior or to otherwise restore his rights to participate in campus events or be on campus property.

137.    Hamilton's failure to remove the interim measures once it no longer had justification for imposing them constituted a violation of its Sexual Misconduct Policy.

## The Roe Investigation

*Doe's First Interview with Investigation Team*

138.    Pursuant to the Policy, Defendant Magnarelli appointed an Investigation Team to investigate Roe's complaint against Doe. The Team included one member of Hamilton's HSMB and two investigators, Defendants Bober and Mudrick. Bober and Mudrick are attorneys with the firm Harter, Secrest & Emery, LLP, and were retained by Hamilton for the purpose of conducting the Roe investigation.

139.    Doe first spoke with the Investigation Team about the Roe matter on May 22, 2017. Because he had been banned from campus and was then living in California, he had no choice but to speak to to the Team via Skype, a medium clearly inferior to an in-person meeting.

140.    Although Doe had no idea what Roe had alleged because he was not provided a copy of her written complaint, Doe gave the Team a complete picture of what transpired between the two on the night in question, and he did so to the best of his recollection some three years after the events took place.

141.    Doe met Roe during his freshman year of college and the two were casual acquaintances. On the night of January 31, 2014, they were at the same party and began talking and flirting. Doe did not see Roe drinking at the party, and she was not acting like she was drunk – she was not slurring her speech or having any difficulty walking, and she was easily able to follow a conversation.

142.    Roe and Doe eventually decided to go back to Doe's room. They walked back to Doe's dorm with their arms around each other.

143.     When they arrived at Doe's unoccupied suite, Doe texted his roommates to say he was with someone and they should not interrupt. Both Doe and Roe had one shot of vodka before sitting down on the couch in the common room and talking.

144.     Eventually they started kissing. Approximately 20 or 30 minutes after they got to the suite, Roe abruptly got up and walked to the bathroom, where she threw up. When she returned to the couch, Doe asked her if she was okay and if she wanted him to take her back to her room. Roe declined and sat back down on the couch.

145.     Roe and Doe talked some more and eventually began kissing again. They began removing articles of clothing and engaging in mutually consensual touching and kissing on each other's bodies. Roe gave Doe a "hickey" on his neck.

146.     While the two were partially disrobed, another female student walked in looking for one of Doe's roommates. She left after seeing Doe and Roe unclothed on the couch.

147.     Doe and Roe resumed kissing. Doe asked Roe if she wanted to give him oral sex; she declined, but said she would stimulate him with her hand instead. Doe and Roe then began touching each other's genitals and continued engaging in consensual sexual activity.

148.     After some time, Doe again inquired if Roe would perform oral sex, and this time she replied, "Why not." She proceeded to perform oral sex on Doe while he was lying on the couch. Doe asked Roe if she wanted to take a shower with him, thinking the sexual encounter could continue there. Roe agreed, and the two made their way to the bathroom.

149.     Once they got to the bathroom, Roe decided not to take a shower with Doe after all because her hair would get wet and she would be cold walking back to her room. Instead, she volunteered to give Doe oral sex again.

150.    Halfway through the act, Roe began confessing that she was "in love with" another male student. Doe, uncomfortable with this revelation, told Roe that if she wanted to leave she could, but Roe said, "It's okay, I'll stay until you [ejaculate]."

151.    Doe and Roe finished their sexual encounter in the bathroom. The two got dressed and talked again for another 20 to 30 minutes in the common room of the suite. Doe asked Roe if she wanted him to walk her home, but she declined. She left his room around 2 or 3 in the morning.

152.    Doe also told the Team that he believed MF and the complainants acted in concert with one another to file false complaints against him and get him expelled from Hamilton.

153.    The Team interviewed MF, who claimed he was simply "spreading awareness." On information and belief, although MF became quite agitated during his interview with the Team, the Team refused to take seriously Doe's valid assertion that MF was the driving force behind the barrage of complaints against Doe.

*Doe's Second Interview With the Investigation Team*

154.    Doe again spoke with the Investigation Team via Skype on June 8, 2017.

155.    Doe was never informed, by anyone at or affiliated with Hamilton, of the names of any other witnesses who were interviewed during the course of the investigation (except the ones he suggested the Team interview).

156.    Likewise, Doe was never given the opportunity to submit questions for the Team to ask the witnesses, even though the witnesses purported to provide information about Roe's allegations and about Doe himself.

157.    Doe was informed, however, that someone – either Smith or Roe – had provided Defendant Magnarelli with the recording of the 2014 conversation between Doe and Smith.

158.    Even though the 2014 recording unequivocally proved that Smith's allegations against Doe were fabricated, Defendants still did not see fit to question the motivation behind the near-simultaneous filing of four complaints of sexual misconduct against Doe, two of which they now knew to be demonstrably false.

*The Investigation Team's Report: Roe's Shifting and Inconsistent Accounts*

159.    Doe did not receive a detailed account of Roe's accusations until June 26, 2017, when he was provided a summary of Roe's interviews with the Investigation Team. He received further details on July 17, 2017, when he got a copy of the Investigation Team's initial report, which included both Roe's written complaint to the Title IX office as well as the summary of her interviews with the Team.

160.    Roe's accounts were internally inconsistent, inconsistent with each other, and inconsistent with Doe's accounts and with other witnesses' accounts.

161.    According to Roe, although she could not remember parts of the night – including how she got to the party, what happened at the party, or how she came to leave the party with Doe – she remembered the sexual encounter with Doe with absolute clarity. In relevant part, Roe claimed:

a.    Roe bit Doe's neck in an effort to stop the encounter, and the bite left teeth marks;

b.    Roe bit Doe's penis while performing oral sex to indicate she was not consenting to it, and in response, Doe yelled at her "for using too much teeth"; and

c.    the door to the suite was locked, suggesting that Doe was somehow holding Roe against her will or preventing others from coming to her aid.

162.    As the initial report made clear, Roe also changed her account of how certain alleged acts transpired during the course of the complaint process. For example, in her written complaint, Roe claimed she was so drunk she could not stand for long, and when she sank to the

floor Doe pushed his crotch towards her and forced his penis into her mouth. Then, when it came time to talk to the Investigation Team, Roe told them Doe pushed her down on her knees in front of him and forced her to perform oral sex.

163.    As it turned out, the available credible evidence did not bear out Roe's unbelievable and shifting version of events. For example:

a.  Although several people observed Doe in the days following his encounter with Roe, not a single witness saw any bite marks on Doe's neck;

b.  As Doe reasonably pointed out to the Team, had Roe actually bitten his neck he would have ended the encounter. Likewise, had Roe bitten his penis, he would not have continued engaging in sexual contact with her; and

c.  The witness who had walked into the suite during the encounter between Doe and Roe confirmed that the door was in fact unlocked, contrary to Roe's claim that she was locked in (or that others were locked out). Furthermore, one of Roe's friends recalled Roe telling her that someone had walked in during the encounter.

164.    Roe also gave wildly varying accounts of her alleged alcohol consumption that night, at times reporting that she was drunk, and at other times saying she could not remember if she was actually drunk, but assumed she was.

165.    While other witnesses who did not observe Roe on the night in question speculated, based on what they had heard from others, that Roe was drunk, the Investigation Team only interviewed one witness, other than Doe, who had actually been with Roe on the night in question.

166.    On information and belief, Roe did not recommend that the Team interview this witness about Roe's level of intoxication; according to Roe, "to anyone else, it was just another night." Instead, the Team proactively sought out this witness in an effort to find "proof" that Roe was intoxicated, because Roe herself could not consistently and conclusively say she was.

167.    This witness said she and Roe drank approximately the same amount. She could not remember how much she drank, but and inferred that because she felt "pretty drunk," Roe was probably drunk too.

168.    Notably, this witness was also Roe's best friend and admitted to the Investigation Team that she did not like Doe.

169.    Nonetheless, none of the witnesses said Roe had any trouble walking or talking, nor did they indicate that Roe was not in control of her faculties. Certainly, no one testified that Roe appeared incapacitated due to alcohol consumption.

170.    Another critical detail that emerged in the initial report was that Roe's immediate concern after the incident was that no one find out she had hooked up with Doe because she believed none of her friends liked Doe. According to the report, Roe sent a text message to a friend on or about the day after the incident admitting, "I did a bad thing," and indicating that "no one else can ever know it would ruin so many things I would be a joke."

171.    Consequently, the evidence was clear that Roe simply regretted her interaction with Doe and was embarrassed by it in the days that followed.

*Clear Flaws and Biases in the Investigative Process*

**Failure to Conduct a Thorough and Impartial Investigation**

172.    Not only was it clear from the Investigation Team's initial report that Roe had fabricated her claims against Doe, it was equally clear the Investigation Team manipulated the process in an effort to bolster Roe's version of events and discredit Doe's in order to comport with Hamilton's policy of absolving the female complainant of blame while assuming guilt on the part of the male respondent.

173.    For example, when the Team questioned Roe about the incident, they did so in a way that was clearly designed to suggest to her that Doe had manipulated her into performing certain sexual acts, even though Roe had not framed it that way in her written complaint about the incident.

174.    At one point during Roe's second interview, the Team asked Roe what she did when Doe "took his penis out and moved her hands towards it." Roe had never reported that this had occurred, however. Rather, the Team *affirmatively suggested* to Roe that this was another non-consensual sexual act Doe forced upon Roe, even though they had no evidence Doe "took his penis out" and "moved [Roe's] hands towards it."

175.    On information and belief, the Investigation Team engaged in similarly improper and leading questioning with other witnesses, one of whom did not even "remember" a particular event until the Team suggested to her that it had happened.

176.    The Investigation Team also wholly ignored the relevant evidence provided to them by Doe concerning MF's involvement in recruiting women to make complaints against Doe in an effort to get back at Doe for having consensual sexual contact with MF's girlfriend. On information and belief, the Investigation Team did not even ask the witness who had direct knowledge of MF's recruitment efforts about those efforts. According to the Team, MF's actions in relation to Doe were "irrelevant" and "outside the scope of the investigation."

177.    Moreover, despite the inconsistencies and clear misstatements of fact in Roe's account, the Investigation Team went to great lengths in their initial report to point out alleged inconsistencies in *Doe's* account. In stark contrast, the Team did not point to *any* of the inconsistencies in Roe's account, and instead found her more truthful because she was visibly emotional during her interviews.

178.    Further, the Investigation Team failed to follow Hamilton's Sexual Misconduct Policy.

179.    For example, in direct contravention of the Policy, the Team failed to ask the witnesses "to sign a statement attesting to the veracity of the information provided." By contrast, the Team asked John Doe to sign, and he did.

*The Final Report and Review Panel*

180.    On July 25, 2017, Doe submitted a response to the initial report in which he pointed to the inconsistencies and improbabilities set forth above. He also repeated his belief that MF set in motion a conspiracy to get him kicked out of Hamilton.

181.    The Investigation Team submitted its final report to the Review Panel on August 18, 2017. The final report was, in all material respects, the same as the initial report.

182.    The Review Panel did not interview Doe or otherwise make any substantive inquiry into the allegations. The Panel's only question for Doe was whether he wanted the recording of his conversation with Smith included in the record.

## The Roe Decision

## Gender Bias Against John Doe as the Male Accused and Failure to Abide by the Requisite Preponderance of the Evidence Standard

183.    The Review Panel, utilizing only the materials provided to it by the obviously biased Investigation Team, found it more likely than not that Doe's actions constituted a non-consensual sexual act and recommended Doe be suspended for five years.

184.    Doe was informed of the Panel's Decision on August 28, 2017.

185.    Despite the fact that the Review Panel is tasked with making "findings of fact," here, the Panel made none, at least not with regard to the alleged incident itself.

186.    The Panel did not either implicitly or explicitly accept Roe's implausible version of events. Of course, the Panel could not have accepted that version as true, given the multitude of conflicting evidence and the simple fact that any reasonable person, including Doe, clearly would not have continued a sexual encounter in which he was being physically abused.

187.    Instead – confronted with ample persuasive evidence that Roe's account was false but nevertheless clearly determined to find Doe, a male student, responsible for a non-consensual sexual act with a female student – the Panel simply invented a reason for Doe's responsibility: Roe's alleged incapacitation, which made her incapable of giving affirmative consent.

188.    This finding was at odds with the evidence and the clear language of Hamilton's Policy concerning consent.

189.    That Policy reads, in pertinent part:

Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent.  Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

190.    The policy goes on to define incapacitation as follows:

Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity because the individual lacks the ability to knowingly make that decision.  In assessing capacity, the College will consider whether the individual had the ability to understand the nature of the act (e.g., to understand the who, what, when, where, why or how of the sexual interaction) and/or is physically helpless. Incapacitation may result from the use of alcohol and/or drugs, but consumption of alcohol or other drugs alone is insufficient to establish incapacitation.  The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs affect an individual's decision-making ability; awareness of consequences; ability to make informed judgments; and capacity to appreciate the nature and quality of the act. Persons who have sexual activity with someone who lacks the mental or physical capacity to consent (including being- substantially impaired by alcohol or other drug use or unconscious) are in violation of this Policy, and any consent perceived to have been obtained is presumptively invalid.

191.    Here, the conclusion that Roe was incapacitated is completely belied by the evidence, which was at best inconclusive concerning Roe's level of intoxication, but which certainly did not indicate Roe was unable to "understand the nature of the act," that she was "physically helpless," or that she in any way "lack[ed] the physical or mental capacity to consent."

192.    Most importantly, Roe herself told the Investigation Team she knew exactly what was going on during the encounter and that she allegedly actively resisted. She set out for the Team her thought processes and reasoning regarding her alleged actions during the encounter, including, without limitation that:

   a.  Roe had the impression that night that Doe wanted to "hook up" and she sensed the situation could be bad;

   b.  Roe thought to herself during the encounter, "he's stronger and in more control than I am right now, and there's no point that I can get away";

   c.  The "shock" of the events made Roe sober up quickly, at which point she ran back to her room;

   d.  Roe woke up the following morning "thinking [she] didn't want that," an obvious indication that she knew what had occurred the night before, how it had occurred, and with whom; and

   e.  Roe sent a contemporaneous text message to a friend indicating that she "did a bad thing" with Doe, again showing that Roe was fully aware of what had transpired between her and Doe on the night in question.

193.    The Review Panel reached an erroneous conclusion based solely on Doe's gender, rather than on the preponderance of evidence before the Panel, in direct violation of Hamilton's Sexual Misconduct Policy and Title IX.

## The Sanction - Unwarranted and Disproportionate in Light of the Circumstances

194.    At the same time the Roe investigation was taking place, another Investigation Team was simultaneously investigating the Miller complaint.

195.    Defendant Martinez informed Doe that Hamilton would not issue a sanction in the Roe matter until the Miller matter was concluded.

196.    On or about September 7, 2017, a separate Review Panel found that the preponderance of evidence did *not* support Miller's claim that she had non-consensual sexual contact with Doe.

197.    Having been absolved of responsibility in the Miller matter, and having had no other disciplinary infractions on his college record, Doe reasonably believed that the Review Panel's recommendation of a five-year suspension for the finding of responsibility in the Roe case was the maximum penalty to which he would be subject.

198.    Indeed, the Review Panel rightly noted that a more severe sanction would be incommensurate with the fact that the allegations were not made until three years after the purported violation and that, during that time, Doe was "continuing coursework and accumulating numerous credits."

199.    Nevertheless, Defendant Martinez, acting arbitrarily and capriciously, unilaterally overruled the judgment of the Review Panel and imposed a sanction of expulsion for the disingenuous reason that "the sanction normally levied for a violation of 'non-consensual sexual act' is expulsion."

200.    This is simply not the case. Hamilton's Sexual Misconduct Policy makes clear that "[i]ndividuals found responsible for a Non-consensual Sexual Act (penetration and/or oral contact) should expect suspension or expulsion from the College."

201.    Thus, the sanction of suspension, while also unwarranted, was consistent with Hamilton's own written policy.

202.    Moreover, as evidenced by the 2015-2016 HSMB report, not a single student found responsible for non-consensual sexual contact that year was expelled. In fact, on information and belief, the College had not expelled anyone for non-consensual sex from at least 2013 through 2016. It was not until the 2016-2017 academic year – the year following the most vocal criticism of Hamilton's failure to expel men found responsible for sexual misconduct – that Hamilton expelled students found responsible for non-consensual sex.

203.    On information and belief, all of the students Hamilton expelled for non-consensual sex in the 2016-2017 academic year were male.

204.    On further information and belief, Defendant Martinez increased the sanction levied on Doe in an effort to make Hamilton appear tough on male "perpetrators" and to appease "survivors'" advocates who had publicly criticized Hamilton's alleged failure to take seriously female students' allegations of sexual misconduct and adequately punish male students found responsible for such acts.

*The Appeal*

205.    The Hamilton Sexual Misconduct Policy allows either party to file an appeal within seven days of the Dean's decision. Grounds for appeal are limited to the following: the sanction imposed is "inconsistent with the severity of the violation or with stated community standards and precedents"; "procedural error(s) that had a material impact on the fairness of the process"; and/or "the discovery of previously unavailable relevant information that could significantly impact the result of the Review Panel's determination."

206.    Consistent with the Policy, Doe appealed the finding and sanction on September 19, 2017.

207.    On September 25, 2017, Hamilton denied Doe's appeal.

208.    Doe's official Hamilton transcript now bears the notation "Expelled after a finding of responsibility for a code of conduct violation."

209.    As a result of Defendants' unlawful actions, Doe has suffered immense losses. He completed all four years of coursework at Hamilton, took all of his finals, and submitted his thesis, but has nevertheless been denied the degree for which he worked so diligently.

210.    It will be enormously difficult for Doe to obtain a college degree from any four-year institution, let alone one comparable to Hamilton, and similarly difficult to obtain any graduate degree. Because of the black mark on his transcript, he will forever have to explain to admissions personnel the reason for his expulsion.

211.    Doe has also experienced extreme emotional, psychological, and physical distress as a result of the investigation process and his expulsion. Without limitation, he was denied the joyful and fulfilling opportunity to celebrate his graduation with his friends and family; he has lost a significant amount of weight and suffers severe mood swings; his ability to concentrate has significantly diminished; and the uncertainty of his future prospects in light of his expulsion from Hamilton weighs heavily on his psyche.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972
#### (Hamilton College)

212.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

213.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

214.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Hamilton.

215.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

216.   Title IX claims arising from university disciplinary hearings are generally analyzed under two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

217.   Both an "erroneous outcome" and an "unjustly severe penalty" occurred in this case.  John Doe was innocent and wrongly found to have committed a violation of Defendant Hamilton's Sexual Misconduct Policy, and gender bias was a motivating factor. Defendant Hamilton imposed an unwarranted and excessive sanction on John Doe as a result of an erroneous outcome reached by a flawed disciplinary process, and gender bias was a motivating factor.

218.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance

procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[6]

219.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[7]

220.    Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of the Roe complaint.

221.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon John Doe. These circumstances include, *inter alia:*

a.    From the outset, the investigation was slanted in favor of the female complainant, who, according to Hamilton, was entitled to have the investigative process explained to her (but John Doe was not) and to be free from any suggestion of blame or fault in connection with her allegations against John Doe.

---

[6] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.
[7] *Id.* at 20.

    b. Defendants failed to take seriously or follow up on John Doe's reports of threats, intimidation and harassment in the wake of the Brown and Miller complaints, and failed to discipline the student(s) involved. On information and belief, Defendants always take seriously reports of retaliation made by female students who have filed complaints of sexual misconduct, including but not limited to disciplining the responsible student(s).

    c. The Investigation Team conducted its investigation and used investigative techniques in a manner designed to attempt to credit the female complainant's version of events and to discredit the male respondent's version of events.

    d. The Team presented a skewed version of the facts when it accepted the complainant's statements at face value, despite the lack of corroboration for many of her assertions and the unreliable witness statements obtained more than three years after the incidents had occurred.

    e. The Review Panel reached a final decision that was directly at odds with the reliable and credible evidence it had before it, and at odds with Hamilton's policies concerning consent and incapacitation. The explanation for its determination is bias against John Doe, a male student.

222.    Further, the Review Panel essentially adopted the Investigation Team's gender-biased treatment of the case and did so with procedures in which there is: no cross-examination; no sworn testimony; no provision for the respondent to have the opportunity to confront and question his accusers or witnesses against him; no provision for respondent to have the opportunity to call witnesses in support of his defense before a fair and impartial decision-maker; and no presumption of innocence but rather a presumption that the female's accusations are true and no reasoned consideration of evidence as required by a burden of proof.

223.    Further, Hamilton has created an environment where an accused male student is denied basic fairness and due process on the basis of sex.

224.    Defendant Hamilton's Sexual Misconduct Policy demonstrates its gender-biased practices with respect to respondents, who are almost invariably male students, accused of sexual misconduct. Specifically, without limitation, the Sexual Misconduct Policy:

- was promulgated *to provide recourse for complainants*, the vast majority of whom are female, rather than to protect both parties throughout the process from unfair and inequitable treatment;

- contains support resources and accommodations designed specifically *for complainants*, the vast majority of whom are female, but contains no comparable support resources and accommodations for respondents, the vast majority of whom are male;

- provides that the Title IX Coordinator will explain the investigative process in detail *to complainants*, the vast majority of whom are female, but provides no concomitant right to respondents, the vast majority of whom are male; and

- explicitly states that retaliation against complainants, the vast majority of whom are female, "will not be tolerated," but provides no such protective assurances to respondents, the vast majority of whom are male;

- affords complainants, the vast majority of whom are female, the right to be free from the suggestion that they are fault or should have acted in a different manner, but provides no identical right to respondents, the vast majority of whom are male.

225.    Based on the foregoing, the Hamilton College Sexual Misconduct Policy is inherently discriminatory against male students accused of misconduct. The Policy fails to ensure a fair and impartial investigation and hearing process.

226.    Moreover, Defendants applied these policies and procedures and gender-biased practices in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous and adverse outcome.

227.    Defendants also imposed an unjustly severe penalty on John Doe, and they did so on the basis of his gender.

228.    Defendants imposed a sanction of expulsion despite the fact that the Sexual Misconduct Policy explicitly states that suspension is also a disciplinary option for students found responsible for a non-consensual sexual act. Defendants imposed this unjustified sanction

in an effort appease campus victims' rights advocates who criticized Hamilton for failing to take sexual violence seriously, and for failing to expel male "rapists."

229.    Upon information and belief, since Defendants partnered with SMART, a victims' rights organization, to review and revise their approach to complaints of sexual misconduct, the number of male students expelled has increased considerably.

230.    Upon information and belief, all students that have been expelled from Hamilton for sexual misconduct have been male.

231.    Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

232.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

233.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract
### (Defendants Hamilton College and Board of Trustees)

234.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

235.    Doe applied to and enrolled in the College and paid associated fees and expenses. Doe did so in reliance on the understanding and with the reasonable expectation that the College

would implement and enforce the provisions and policies set forth in its official publications, including Sexual Misconduct Policy.

236.    An express contract or, alternatively, a contract implied in law or in fact was formed between Doe and the College.

237.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

238.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with John Doe, and the covenant of good faith and fair dealing contained therein.

239.    Defendants committed several breaches of their agreements with John Doe during the investigation process. A non-exhaustive list of Defendants' breaches include the following:

**Defendants failed to complete the investigation within 60 days.**

240.    Hamilton's Sexual Misconduct Policy provides: "In general, parties can expect that the College will conclude all reports of Sexual Misconduct within sixty (60) days (exclusive of any appeal) and, in general, parties can expect that the process will proceed according to the time frames provided in this Policy.

241.    Defendants, in breach of this policy, took over four months to complete the investigation of the subject incident.

**Defendants failed to utilize the preponderance of the evidence standard.**

242.    At the time the subject incident was adjudicated, the U.S. Department of Education Office of Civil Rights and Hamilton's Sexual Misconduct Policy required that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct.

OCR has subsequently issued guidance allowing for the use of a "clear and convincing evidence" standard.

243.    Defendants breached their agreement with John Doe when they failed to utilize the preponderance of the evidence standard in reaching the Decision. Had Defendants done so, they would have reached the opposite conclusion; namely, that John Doe was not responsible for the misconduct alleged.

244.    Based on the foregoing, a fair reading of the evidence reveals that Roe's account of the events lacked any corroboration or reliability. Yet John Doe was inexplicably deemed less credible.

245.    Based on the foregoing, a fair reading of the evidence reveals that Roe was not incapacitated by alcohol and did not lack the ability to consent.

246.    Defendants thus breached their contract with John Doe, and the covenant of good faith and fair dealing contained therein, when they failed to utilize and apply the requisite preponderance of the evidence standard.

**Defendants failed to provide a supportable rationale for the Decision.**

247.    Hamilton's Sexual Misconduct Policy requires the Review Panel to "prepare a brief written summary of its determination, including findings of fact and a rationale for its determination and recommended sanction[.]"

248.    The Review Panel made no "findings of fact" related to the incident in question.

249.    The only "findings of fact" the Review Panel made were in relation to Roe's alleged incapacitation and, therefore, her alleged inability to consent.

250.    These "findings of fact" were directly contradicted by the evidence, including by Roe's own statements concerning her clear understanding of the incident as it was occurring.

251.    The Review Panel thus failed to provide any supportable rationale or explanation for its determination that Roe was incapacitated and lacked the ability to consent, yet John Doe was held responsible for a non-consensual sexual act with Roe on this basis alone.

252.    Accordingly, Defendants breached their contract with John Doe, and the covenant of good faith and fair dealing contained therein, when they failed to provide findings of fact related to the incident itself, or any valid rationale for the outcome.

**Defendants failed to address retaliation and Code of Conduct violations against John Doe.**

253.    Defendants breached their contract with John Doe when they failed to prevent or penalize acts of intimidation and retaliation against John Doe.

254.    Hamilton's Code of Student Conduct prohibits "Physical abuse, verbal abuse, threats, intimidation, harassment, coercion and/or other conduct that recklessly or intentionally threatens or endangers the mental or physical health and safety of any person."

255.    Hamilton's Sexual Misconduct Policy provides, "Hamilton prohibits retaliation against individuals who pursue complaints or who are otherwise involved in any of the processes outlined in this Policy. The College will take appropriate and strong responsive action if retaliation occurs."

256.    Nonetheless, Defendants failed to abide by these policies when fellow Hamilton student MF engaged in acts of threats, intimidation, harassment, and retaliation against John Doe.

257.    Despite the public and repeated acts of threats, intimidation, harassment, and retaliation against John Doe, Defendants failed to take any steps to ensure that such behavior ceased and/or to penalize the individual responsible for the behavior.

258.    As a direct and foreseeable consequence of the foregoing breaches, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

259.    John Doe is entitled to recover damages for Defendants' breaches of the express and/or implied contractual obligations described above in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AND AS FOR A THIRD CAUSE OF ACTION**
**Breach of Contract/Common Law: Denial of Basic Fairness/**
**Arbitrary and Capricious Decision Making**
**(All Defendants)**

260.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

261.    Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against John Doe were conducted with basic fairness.

262.    Defendants breached this duty of basic fairness by, without limitation:

- Failing to provide John Doe with the same protections explicitly afforded the complainant under Hamilton's Sexual Misconduct Policy, including, without limitation, the right to policies and procedures designed to protect the rights of *both* complainants and respondents; the right to have the sexual misconduct investigation process explained to him in detail prior to engaging in that process; and the right to a presumption of innocence unless and until the preponderance of evidence warrants a finding of responsibility (Hamilton; Board of Trustees);

- Failing to provide John Doe the opportunity to confront and question witnesses at a fair hearing (Hamilton; Board of Trustees);

- Failing to protect John Doe from retaliation (Hamilton, Magnarelli);

- Failing to lift the damaging interim measures imposed on John Doe when the stated rationale for those interim measures was no longer present (Hamilton, Magnarelli);

- Failing to complete the investigation(s) until the fall of the academic year following the lodging of the complaint(s), approximately four months after John Doe was supposed to graduate from Hamilton (Hamilton, Board of Trustees);

- Arbitrarily and capriciously finding that the complainant was incapacitated and unable to consent when the preponderance of evidence unquestionably showed that the complainant was neither incapacitated nor unable to consent (Hamilton);

- Arbitrarily and capriciously expelling John Doe when Hamilton's Policy explicitly provides for suspension after a finding of a non-consensual sexual act (Hamilton, Martinez);

- Arbitrarily and capriciously expelling John Doe when Hamilton's history of sanctions in sexual misconduct proceedings demonstrates that it did routinely expel students found responsible for a non-consensual sexual act (Hamilton, Martinez).

263.   Defendants' breach of the duty to ensure basic fairness proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

264.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
### Unfair or Deceptive Trade Practices
### (Defendants Hamilton College and Board of Trustees)

265.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

266.   New York General Business Law § 349: Deceptive Acts and Practices Unlawful provides consumer protection by declaring as unlawful "Deceptive acts or practices in the

conduct of any business, trade or commerce or in the furnishing of any service in this state…"

*See* New York General Business Law § 349.

267.    Hamilton's Sexual Misconduct Policy states, among other things:

All members of the Hamilton College community are expected to conduct themselves in a manner that does not infringe upon the rights of others. Hamilton seeks to provide an environment in which students, faculty, staff, and guests can work, study, and enjoy the College community without experiencing sexual misconduct, domestic violence, dating violence, or stalking. In addition to being antithetical to Hamilton community values, these acts are prohibited under College policy, New York State law and by federal laws such as Title IX. When such actions are brought to its attention, the College is committed to providing prompt and thorough responses to actions that adversely impact, or have the potential to adversely impact, the educational or workplace environment of any member of the Hamilton community.

[ . . . ]

All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal funds must comply with Title IX. Title IX mandates that colleges and universities create an environment free from sexual discrimination and harassment for all community members. The College recognizes its obligation under Title IX to take steps to prevent the recurrence of Sexual Misconduct and to correct its discriminatory effects.

Under Title IX, discrimination on the basis of sex includes sexual harassment, gender-based harassment, sexual violence, sexual assault, and other forms of sexual misconduct. Sexual harassment is also prohibited under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and other applicable statutes.

268.    Based on the foregoing, Hamilton's Sexual Misconduct Policy sets forth the procedure by which Hamilton students who have been accused of violating one or more of the policies are investigated and, possibly, disciplined.

269.    Defendant Hamilton has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, including potential applicants to Defendant Hamilton, that

were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances: by causing John Doe to believe that Hamilton would follow its policies, copies of which were provided to John Doe and are also available on Hamilton's Internet website; and by causing John Doe to believe that if he paid tuition and fees to Hamilton, that Hamilton would uphold its obligations, covenants and warranties to John Doe as described in its policies.

270.    Defendant Hamilton had no intention of following its own policies and procedures for John Doe as the male accused of sexual misconduct when it found John Doe responsible for a non-consensual sexual act absent any credible or corroborating information supporting such a finding.

271.    Defendant Hamilton's stated policies and procedures, together with its violations thereof only with respect to John Doe as the male accused of sexual misconduct, demonstrate Hamilton's deceptive practices with respect to males accused of sexual misconduct at Hamilton.

272.    Based on the foregoing facts and circumstances, Hamilton engaged in unfair or deceptive trade practices in violation of N.Y. GBS. LAW § 349.

273.    As a result of Hamilton's deceptive acts and practices, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

274.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### <u>Estoppel and Reliance</u>
**(Defendants Hamilton College and Board of Trustees)**

275.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

276.    Hamilton's various policies constitute representations and promises that Hamilton should have reasonably expected to induce action or forbearance by John Doe.

277.    Hamilton expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Hamilton would not tolerate, and John Doe would not suffer, discrimination or harassment by fellow students or faculty members and would not deny John Doe his procedural rights should he be accused of a violation of Hamilton's policies.

278.    John Doe relied to his detriment on these express and implied promises and representations made by Hamilton, by choosing to attend Hamilton rather than other schools of equal caliber and paying the required tuition and fees.

279.    Based on the foregoing, Hamilton is liable to John Doe based on Estoppel.

280.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

281.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Negligence
#### (Hamilton College)

282.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

283.    Defendants owed duties of care to John Doe. Such duties included, without limitation, a duty of care to conduct an impartial and thorough investigation of the allegations of sexual misconduct against him, a duty of care to utilize the preponderance of the evidence standard in reaching a determination, and a duty of care to maintain an environment free from threats, intimidation, harassment, and retaliation.

284.    Based on the foregoing, Defendants negligently breached their duties owed to John Doe.

285.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

286.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN SEVENTH CAUSE OF ACTION
### Violation of New York State Human Rights Law
#### (Hamilton College)

287.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

288.    Defendant Hamilton is an education corporation organized and operating as such under the laws of the State of New York.

289.   The New York State Human Rights Law § 296(4) provides "[i]t shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]" N.Y. Exec. Law § 296(4).

290.   Hamilton's Sexual Misconduct Policy states, in pertinent part:

> All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal funds must comply with Title IX. Title IX mandates that colleges and universities create an environment free from sexual discrimination and harassment for all community members.  The College recognizes its obligation under Title IX to take steps to prevent the recurrence of Sexual Misconduct and to correct its discriminatory effects.

> Under Title IX, discrimination on the basis of sex includes sexual harassment, gender-based harassment, sexual violence, sexual assault, and other forms of sexual misconduct. Sexual harassment is also prohibited under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and other applicable statutes.

291.   Based on the foregoing, Hamilton permitted discrimination against John Doe on the basis of his sex.

292.   Based on the foregoing, Hamilton authorized, condoned and/or acquiesced to discriminatory conduct against John Doe.

293.   Based on the foregoing, Hamilton knew or should have known of such discriminatory conduct and failed to undertake action to prevent it.

294.   Defendant Hamilton engaged in the following discriminatory acts or practices against John Doe as the male accused: Hamilton subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his gender; Hamilton failed to adhere to its Sexual Misconduct Policy, and the Policy itself is insufficient to protect the rights of male students; the Decision was discriminatory in that, given the evidence

(or lack thereof) of incapacitation and consent, the only possible way to reach the Decision was a discriminatory bias against males.

295.    Based on the foregoing facts and circumstances, Hamilton engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

296.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

297.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendants as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)      on the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for denial of basic fairness under contract and common law, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(iv)     on the fourth cause of action under New York General Business Law § 349 Deceptive Acts and Practices Unlawful, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action under New York State Human Rights Law § 296(4), a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)    a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Hamilton should be reversed; (ii) Plaintiff's reputation should be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's expulsion be removed from his education file; and (v) any record of the complaint against Plaintiff be permanently destroyed;

(ix)    an injunction directing Hamilton to: (i) reverse the outcome and findings regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's expulsion from his education file; and (iv) permanently destroy any record of Roe's complaint; and

(x)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         October 30, 2017

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Plaintiff*

By: /s/ Andrew T. Miltenberg
Andrew T. Miltenberg, Esq. (517014)
Tara J. Davis, Esq. (519928)
Stuart Bernstein, Esq. (520831)
Alexandra H. Deal, Esq. (*admission pending*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com
sbernstein@nmllplaw.com
adeal@nmllplaw.com